**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Marshal Roush,

        Plaintiff,

vs.

Aetna, et al

        Defendants.

No. CV 09-751-PHX-NVW

**ORDER**

In this ERISA long term disability case, Plaintiff contends that Defendants improperly terminated his benefits. Before the Court are the parties' cross motions for judgement on the administrative record. After carefully considering the papers filed by the parties and holding a hearing on April 9, 2010, the Court grants Plaintiff's motion (doc. #39) and denies Defendants' motion (doc. #41).

**I.    Background**

Plaintiff Marshal Roush is a fifty-four year old man who worked for Defendant Cox Enterprises, Inc. ("Cox") in Nevada. When Roush applied for disability benefits, he was earning a yearly salary of approximately $44,000, and had been working for Cox for twelve years.

At Cox, Roush was a Fiber Technician, responsible for building, splicing, and repairing fiber. He reported that he was required to sit up for about three hours per day,

and stand and walk for about three hours per day. He frequently lifted up to fifty pounds or more, and was required to bend, stoop, reach above his shoulders, and push and pull objects. He worked on call from eight to twenty-four hours a day. (AET/ROU 286).

On June 27, 2006, Roush left work due to illness. In November 2006, he submitted a claim for long term disability benefits under Cox's Long Term Disability ("LTD") Flex Plan ("Plan"). The Plan is self-insured and is funded by Cox and by employee contributions. (AET/ROU 140, 123).

Under the Plan, a person is considered totally disabled if:

In the first 24-month period of disability you are not able, solely because of injury or disease, to work at your own occupation.

After the first 24 months of a period of disability you cannot work at any reasonable occupation, solely because of injury or illness.

A reasonable occupation is defined as any gainful activity which you are or reasonably could become qualified to perform through education, training or experience earning equal to your LTD benefit but no less than 60% of predisability earnings. It does not include an approved rehabilitation program.

(AET/ROU 96, 141).

The Plan document gives Defendant Aetna Life Insurance Company ("Aetna") the right to have a physician examine any person for whom benefits have been requested. (AET/ROU 147). Claims must be submitted to Aetna, and it has the right to require, as part of proof of a claim for LTD benefits, proof of other income benefits received. (AET/ROU 148). The Plan document also states that Aetna will provide administrative services under an Administrative Services Agreement ("ASA"):

The Plan described in the following pages of this Booklet is a benefit plan of the Employer. These benefits are not insured with Aetna Life Insurance Company ("Aetna") but will be paid from the Employer's funds. Aetna will provide certain administrative services under the Plan as outlined in the Administrative Services Agreement between Aetna and the Customer.

ASA: 770409

* * *

This Booklet may be an electronic version of the Booklet on file with your Employer and Aetna Life Insurance Company. . . . To obtain a printed copy of this Booklet, please contact your Employer.

- 2 -

1    (AET/ROU 140).

2        The Summary Plan Description ("SDP") provides that Cox is the plan

3    administrator and Aetna the claims administrator.  (AET/ROU 101, 123).  The plan

4    administrator (Cox) is empowered to "exercise discretion in the interpretation of the terms

5    of the plans or programs."  (AET/ROU 108).  The plan administrator's "determinations

6    regarding terms and eligibility" are "conclusive and binding."  (AET/ROU 108).  The

7    claims administrator (Aetna)  "has final authority to determine the amount of benefits that

8    will be paid on any particular benefit claim."  (AET/ROU 110).  In making such

9    determinations, the plan administrator (Cox) "has the complete discretion and authority to

10   make factual findings regarding a claim and to interpret the terms of the plan as they

11   apply to the claim."  (AET/ROU 110).

12       The SDP also provides that a claimant is required to apply for other income

13   benefits for which he might be eligible: "Aetna will conduct an independent evaluation to

14   determine your eligibility for Cox LTD benefits.  However, you still need to apply for

15   Social Security benefits at the same time you apply for LTD.  Services are available to

16   assist you through this process at no cost."  (AET/ROU 102).  A claimant must also

17   appeal a denial of Social Security benefits to the highest level possible.  If a claimant is

18   awarded Social Security benefits, the claimant is responsible for reimbursing the amount

19   received as LTD benefits that would have been reduced by the Social Security benefit

20   award.  (AET/ROU 102).

21       Another clause in the SDP states that the SDP is not part of the official Plan

22   document that governs the terms of the Plan.  Instead, the Plan document "is the

23   controlling legal document covering the provisions of the plans or programs within the

24   Welfare Plan.  If there are any discrepancies between [the SDP] and the [P]lan document,

25   the [P]lan document will govern."  (AET/ROU 108).  Finally, the SDP, like the Plan

26   document, contains a reference to the ASA: "Benefits for the medical, dental and long-

27   term disability plans are provided under the administrative services contract number

28   50398/779409."  (AET/ROU 124).

The ASA, in turn, provides that Aetna is a fiduciary of the Plan for purposes of reviewing denied claims, and that it exercises discretionary authority in determining entitlement to Plan benefits:

> Fiduciary Duty. It is understood and agreed that the Customer retains complete authority and responsibility for the Plan, its operation, and the benefits provided thereunder, and that Aetna is empowered to act on behalf of Customer in connection with the Plan only to the extent expressly stated in the Services Agreement or as agreed to in writing by Aetna and Customer.

> Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, Aetna will be the "appropriate named fiduciary" of the Plan for purposes of reviewing denied claims under the Plan. In exercising such fiduciary responsibility, Aetna will have discretionary authority to determine entitlement to Plan benefits as determined by the Plan Documents for each claim received and to construe the terms of the Plan. It is also agreed that Aetna's decision on any claim is final and that Aetna has no other ERISA Fiduciary responsibility under the Plan.

(AET/ROU 167).

In 2006, Roush was diagnosed with "agoraphobia/anxiety" by his physician, John Waite, M.D., a board certified psychiatrist. (AET/ROU 277). In his initial claim forms, Roush stated that his condition prevented him from working because he could not be around groups of people, could not to drive or work inside a building, and at times could not leave his house. Roush was prescribed Xanax, Seroquil, and Lexapro. (AET/ROU 312). His Attending Physician Behavioral Health Statement listed his primary diagnosis as "Panic Disorder," and his Axis V GAF as 40.[1] (AET/ROU 312). Roush's "subjective symptoms and complaints" included "[i]nability to cope with stress and responsibility,

---

[1]"Axis V is for reporting the clinician's judgment of the individual's overall level of functioning." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32-33 (4th ed. 2000). The GAF scale is divided into 10 ranges of functioning. *Id*. A GAF score of 40 is defined as, "Some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id*. at 34.

[p]anic [a]ttacks, and [g]eneralized anxiety."  Dr. Waite's "objective findings" were, "mood swings, depression, insomnia."  (AET/ROU 302).   Roush saw his doctor once a month.  (AET/ROU 302).  He applied for Social Security Disability Insurance ("SSDI") benefits, and agreed to reimburse Aetna, on behalf of the Plan, for any overpayments resulting from the retroactive award of benefits.  (AET/ROU 282).

As part of its evaluation of Roush's initial claim, Aetna obtained Roush's psychiatric record, including Dr. Waite's notes of office visits with Roush dating back to May 2006.  On May 30, 2006, Dr. Waite wrote that Roush felt "less depressed," but was experiencing anxiety attacks and had difficulty relaxing.  (AET/ROU 346).  In June, Roush reported having side effects from his medications.  He was having difficulty sleeping, and was still anxious and worried about having panic attacks.  (AET/ROU 346-47).

On August, 3, 2006, Dr. Waite wrote that Roush had gone by motorcycle to see his sister in Oregon.  Roush told Dr. Waite that the drive was very stressful and that he had taken a lot of Xanax to calm down.  He thought that he "bit off more than he could chew and should not have attempted the trip."  (AET/ROU 347).  On August 30, 2006, Roush reported that he continued to have panic attacks.  He was upset because he spoke to an Aetna insurance representative who told him that he doubted that Dr. Waite was a real doctor.  Dr. Waite called the insurance representative and offered to answer the representative's questions.  (AET/ROU 347).

On September 26, 2006, Dr. Waite wrote that Roush continued to describe the symptoms of Panic Disorder with Agoraphobia.  (AET/ROU 348).  Roush was still having panic attacks, could not go into crowds or shops like Walmart, and believed that he could not work in his present condition.  (AET/ROU 348).  By October, however, Roush felt that his illness had "pleateaued out," and was thinking of going back to Ohio. Roush complained that the Lexapro did not appear to be helping him and told Dr. Waite that he was taking less Xanax without any side-effects.  (Notes for October 25, 2006, AET/ROU 348).

On December 14, 2006, Aetna sent Roush a letter asking him to forward all copies of office visit notes, medical records, and test results from May 31, 2006, through present, from Dr. Waite. (AET/ROU 352). Roush provided the records with additional notes from Dr. Waite for November 29, 2006. In the November notes, Dr. Waite commented that Roush "remain[ed] somewhat chaotic" and that he felt insecure, anxious, and disorganized. (AET/ROU 358). Roush seemed to be having "difficulty making up his mind about things," especially whether or not to stay in Las Vegas or return to Ohio. (AET/ROU 358).

On or about December 28, 2006, Aetna sent Dr. Waite a questionnaire asking him to state: (1) whether Roush felt that his condition would not improve and that he would never again be capable of working; (2) whether Roush's psychiatric conditions and symptoms were of the severity that would prevent him from performing the essential duties of his occupation as a fiber splicer; and (3) to list the specific impairments that existed and the most recent objective mental status examinations that would support that level of impairment. (AET/ROU 375).

In response, Dr. Waite wrote on January 17, 2009, that: (1) Roush felt that his condition would not improve and that he would not regain the capacity to work; (2) Roush was currently experiencing psychiatric symptoms of the severity that would render him unable to perform the essential duties of his occupation; and (3) Roush had mood swings, unpredictable anxiety attacks, inability to cope with stress or responsibility, anticipatory anxiety, demoralization, loss of self-confidence, insomnia, and nightmares. (AET/ROU 387). Dr. Waite also provided the results of a "Mental Status Examination" for January 17, 2007, and stated that Roush had "mood swings and depression," "hopelessness and helplessness, inability to cope with stress and responsibility," "low self-esteem and lack of self-confidence," and "inability to make decisions oriented to time, place and person." He noted, however, that Roush had "good long term and short term memory," and was "not feeling homicidal or suicidal[,] not experiencing

hallucinations or delusions[,] not receiving messages from radio or tv[, and] denie[d] having special powers." (AET/ROU 387).

On the basis of this evidence, Aetna approved Roush's claim. On January 19, 2007, Aetna notified Roush that he satisfied the "'own occupation' definition of disability" under the LTD Plan, and was eligible for benefits as of December 28, 2006. (AET/ROU 400). The letter also explained that the Plan required Aetna to periodically re-evaluate Roush's eligibility by requesting updated medical information from his physician or an independent physician of Atena's choosing. If Roush was still eligible for benefits on June 28, 2008, the Plan would require him to satisfy a stricter definition of disability.

On January 24, 2007, Aetna sent another letter to Roush stating that it had "carefully reviewed the medical documentation . . . and determined that there [was] a high probability" that Roush would qualify for SSDI benefits. Aetna stated, "We have referred you to Allsup, Inc., an organization that provides expert representation at all Social Security levels. Allsup's services on your behalf will be provided at no cost to you." The letter proceeded to list the "numerous financial advantages available to you and your family if you obtain a SSDI award with Allsup's assistance." (AET/ROU 400-04).

On April 27, 2007, Aetna requested that Roush provide the last three office visit notes, medical records, and test results from Dr. Waite. (AET/ROU 425). Roush provided additional notes from Dr. Waite for January 17, 2007, and March 22, 2007. (AET/ROU 433). The January notes stated that Roush could not cope with stress and responsibility, was becoming more accepting of not being able to do what he used to do, and tended to stay at home and not go out much. (AET/ROU 433). In March, Dr. Waite wrote that he told Roush that he would soon be retiring from private practice. Roush responded that he planned to emigrate to New Zealand in two months, so Dr. Waite could care for him until then. (AET/ROU 434). Dr. Waite also wrote that Roush "continues to drive and to avoid situations that are toxic to him and which cause him anxiety," and

"continues to have difficulty coping with any kind of stress," but that Roush felt that "the medication [was] helping him." (AET/ROU 434).

On August, 17, 2007, Aetna asked Roush to provide a second Behavioral Health Statement. That statement, dated August 22, 2007, was essentially unchanged from the statement Roush submitted with his initial claim form in November 2006. Dr. Waite listed Roush's primary diagnosis as "panic disorder," and Roush's subjective symptoms as "inability to cope with stress or responsibility[,] panic attacks[,] generalized anxiety[,] mood swings[, and] depression." (AET/ROU 448-50). Dr. Waite's objective findings were "mood swings[,] depression[,] panic attacks[, and] anxiety." (AET/ROU 448-50). Roush was taking Lexapro, Xanax, and Seroquel, and saw Dr. Waite every two months. (AET/ROU 448-450). Dr. Waite wrote that Roush's estimated return to work date was September 1, 2008, and that Roush was motivated to return to work. (AET/ROU 448-50).

On August 30, 2007, an Aetna employee noted that, based on the information provided by Dr. Waite, Roush continued to meet the definition of disability under the Plan. (AET/ROU 452). On November 5, 2007, Aetna sent Roush a letter notifying him that it was beginning an investigation to determine whether, based on his employment and educational history, as well as his medical condition, Roush would continue to remain disabled from any reasonable occupation effective June 28, 2008. (AET/ROU 455). Aetna also asked Roush to complete several forms, and to have his treating physician complete another Behavioral Health Attending Physician Statement and a Capabilities and Limitations worksheet. (AET/ROU 455-56).

In his responsive documents, Roush described his daily living activities. He wrote that he did not have a car. He had a license for a motorcycle, but only drove his motorcycle if absolutely necessary. He sometimes used public transportation, but doing so was "very scary." He frequently used a bicycle to make trips to the store and to the doctor. (AET/ROU 468-71).

Roush always made sure his routine did not change, because otherwise it would upset his whole day and "probably lead to an anxiety attack." He would forget simple things every day and had timers with alarms that he used to remind himself of day-to-day tasks. Most of his bills were automatically withdrawn and some were paid by his daughter. A cleaning person would come to his house once a week, and family and friends helped with other chores. As far as social contacts, he used to love to ride his motorcycle and to fly, but now both scared him. He cancelled his motorcycle classes, stopped volunteering in his community, stopped going to church, and stopped visiting friends, dating, and going to bars. (AET/ROU 468-71).

On December 11, 2007, Aetna again requested copies of office visit notes, medical records, exam notes, and any available test results. Aetna also requested another Behavioral Health Statement and a Capabilities and Limitations worksheet from Dr. Waite. (AET/ROU 480). Dr. Waite provided a behavioral statement that was virtually unchanged from the August 17, 2007 statement, except that it was dated December 12, 2007, and Roush's return to work date was updated to May 16, 2008. (AET/ROU 482).

Roush also submitted office visit notes for July, 24, 2007. These notes indicated that Roush was "still trying to keep a low profile" and was staying "out of trouble." Roush had not sold his house and his plans for moving to New Zealand were on hold. He was "keeping his life simple and uncomplicated so as to avoid stress," and was still experiencing "some difficulty sleeping," but had not had any severe panic attacks recently. (AET/ROU 491). The notes for September 18, 2007 indicated that Roush was still trying to sell his house, but had not been able to do so because the bottom had dropped out of the market. Roush was keeping a low profile and was "fine" as long as he was not under stress. He was thinking about stopping his medication, but Dr. Waite advised against it. (AET/ROU 491).

On February 4, 2008, Aetna again asked Roush to have Dr. Waite send Aetna copies of all mental status exams and evaluations. (AET/ROU 504). Roush provided copies of Dr. Waite's notes, including new notes for January 24, 2008, which indicated

that Roush had decided to move to Phoenix with his son, was able to rent his house in Las Vegas, and continued to live a low stress life and to avoid any conflicts. Roush was now taking Lipitor, Seroquel, and Xanax. (AET/ROU 509).

On February 28, 2008, an Aetna employee noted that Roush's documented behavior was not consistent with impairment, and that it was appropriate, at that juncture, to seek peer review. (AET/ROU 514). Aetna hired Dr. Burnstein, a psychologist, to conduct a peer review evaluation. Dr. Burnstein reviewed Dr. Waite's "clinical notes and other documents" and spoke with Dr. Waite. He concluded that recent office visit notes did not appear "reflective of impairment," and did not contain any examples of Roush's behavior or measurements of Roush's cognitive functioning to corroborate his subjective complaints or to support the presence of impairments. (AET/ROU 529). Dr. Burnstein wrote that Dr. Waite told him that Roush had a "lack of motivation and desire" to work and never received psychotherapy due to his lack of motivation. (AET/ROU 529). Dr. Burnstein indicated that for Roush to support his claim, his provider "would have to submit exam findings documenting impairments," such as behavioral observations, results of a formal mental status examination, or performance-based tests of cognitive functioning. (AET/ROU 528).

Based on Dr. Burnstein's report, Roush's benefits were terminated. (AET/ROU 525, 526, 533). On April 7, 2008, Aetna sent Roush a termination letter stating that it had reviewed Dr. Waite's notes and the Behavioral Health Statement he provided and could not "clearly assess" Roush's capacity level. The letter stated, "No information [has been] provided to indicate you are unable to perform the duties of your own occupation." Aetna indicated that if Roush intended to appeal, he could submit "a detailed narrative report, outlining in objective terms the specific physical and/or mental limitations inherent to your condition[,] . . . [a] physician's prognosis including current course of treatment, frequency of visits, [and] specific medications prescribed[,] . . . [and] any other information or documentation you believe may assist us in reviewing your claim." The letter also stated, in general terms, that Roush could provide "copies of diagnostic studies

conducted . . . such as test results, X-rays, laboratory data, and clinical findings." (AET/ROU 553). Aetna did not specifically mention Dr. Burnstein's recommendation that Roush provide behavioral observations, results of a formal mental status examination, or performance-based tests of cognitive functioning.

On June 10, 2008, Roush's attorney, Scott Davis, sent letter to Aetna, requesting a copy of Roush's file and notifying Aetna that Roush was appealing the decision. (AET/ROU 566). On September 15, 2008, Roush was awarded SSDI benefits dating back to December 2006. The Administrative Law Judge's ("ALJ") opinion stated that Roush had become disabled under the Social Security rules beginning on June 27, 2006. (AET/ROU 592). Allsup Inc. ("Allsup"), the firm that represented Roush before the Social Security Administration ("SSA"), provided a copy of the decision to Aetna by at least October 2, 2008. (AET/ROU 596). On October 6, 2008, Aetna sent a letter to Roush asking him to reimburse the Plan for the portion of the benefits he received beginning in December 2006 that were covered by the SSDI award. (AET/ROU 604). Roush reimbursed the Plan promptly.

Aetna began reviewing Roush's appeal on October 6, 2008. (AET/ROU 608). On November 4, 2008, Roush, through his attorney, submitted additional evidence of his disability. He provided a vocational expert report by Robin Generaux, Ph.D, a Severity of Mental Impairment report, notes from Dr. Waite through April 18, 2008, and the ALJ's favorable decision.

Dr. Generaux evaluated Dr. Waite's notes from Roush's first visit on May 2006 through August 2008 and interviewed Roush. She concluded that "Mr. Roush is completely disabled from his prior occupation and any occupation that may exist in the national economy. This is the result of a combination of factors including his extraordinary psychological dysfunction and the effects of the medications that he is taking which cause him to be lethargic." (AET/ROU 627)

Roush's "Severity of Mental Impairment" report, dated July 1, 2008, stated that Roush was markedly limited in his ability to complete a work day without interruptions

from psychologically based symptoms, and moderately limited in his ability to respond appropriately to criticism from supervisors, get along with co-workers, and maintain socially appropriate behavior. He was also mildly limited in his ability to respond appropriately to changes in his environment and to be aware of normal hazards and take appropriate precautions. (AET/ROU 631-34). Dr. Waite's notes from April 8, 2008, confirmed that Roush's mental status "remain[ed] the same." (AET/ROU 635).

Roush also submitted the ALJ's favorable decision. The ALJ decided Roush's case without a hearing, something that Dr. Generaux noted was "unusual" in disability cases and indicative of the strength of Roush's evidence of disability. The ALJ concluded that Roush suffered from an anxiety disorder. She wrote that Dr. Waite reported that Roush was markedly impaired in his ability to work with others, give supervision, work in a group setting, maintain persistence to task, and work alone or in physical isolation. She also gave "significant weight" to several affidavits submitted by Roush's friends and family members. (AET/ROU 644).

Following Roush's submission of additional documentation, Aetna asked psychiatrist Randy Rummler, M.D., to conduct a second peer review evaluation. Dr. Rummler never personally examined Roush, but he conducted a peer-to-peer consultation with Dr. Waite on December 19, 2009. Dr. Rummler wrote that Dr. Waite told him that Roush had no stress if he was not working and seemed relatively satisfied with his life. Dr. Rummler also noted that Dr. Waite believed that if Roush returned to work he would become symptomatic, but otherwise presented a picture of Roush being essentially free of panic attacks. (AET/ROU 662). Dr. Rummler wrote that Roush had no prior inpatient admissions or formal psychological or neurocognitive testing, and that Roush was not pursuing cognitive therapy, which would presumably be helpful if he wished to return to work. Although Dr. Rummler noted that the approval letter for benefits from the SSA and the vocational analysis from Dr. Generaux had been submitted to him for review, he never discussed them. (AET/ROU 661-664).

Dr. Rummler also believed that additional documentation such as a "formal mini mental status examination, psychological or neuropsychological testing to document cognitive deficits" could be helpful. "[M]ore intensive treatment, such as ongoing therapy, to document [Roush's] efforts at dealing with panic disorder in stressful situations and whether such efforts were successful or not" would assist in determining whether actual impairment existed. (AET/ROU 663). Ultimately, Dr. Rummler concluded that there was "no evidence that claimant's ability to work has been impacted by an adverse medication effect," and that there was no evidence that "restrictions and limitations outlined by the treating provider are appropriate." (AET/ROU 663).

On January 26, 2009, Aetna sent Roush's attorney a letter explaining that it had reached an unfavorable decision on Roush's appeal and had found that there was a lack of medical evidence to support that Roush was not able "to work at *any* reasonable occupation." The grounds for the decision were virtually the same as those in the Rummler report; specifically, Aetna indicated that Roush had not provided sufficient medical evidence of impairment, such as a formal mini mental status examination, psychological or neuropsychological testing to document cognitive deficits, or evidence of more intensive treatment such as ongoing therapy. Aetna stated that the SSDI approval letter was reviewed but that there was no clinical evidence to support an impairment as defined by the Plan. (AET/ROU 674-76).

## II.    The Standard of Review is De Novo

A denial of benefits is reviewed de novo, unless the benefit plan gives the fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations*, 244 F.3d 1109, 1112 (9th Cir. 2001). Where the plan grants the fiduciary discretionary authority to determine eligibility for benefits, a deferential standard of review is appropriate. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 2348 (2008). "The administrator has to show that the plan

- 13 -

gives it discretionary authority in order to get any judicial deference to the decision." *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1325 (9th Cir. 1992). For the reasons stated below, the Plan does not confer discretionary authority upon Aetna, and the standard of review is de novo.

### A. The SDP Does Not Unambiguously Confer Discretionary Authority Upon Aetna

A fiduciary or administrator has discretion only where discretion is unambiguously retained. *Ingram*, 244 F.3d at 1112 (quoting *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc)). "There are no 'magic' words that conjure up discretion on the part of the plan administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006), abrogated on other grounds by *Glenn*, 128 S. Ct. 2343. Wording that grants the fiduciary the power to interpret plan terms and to make final benefits determinations confers discretion. *See id*.

On the other hand, a plan does not confer discretionary authority when it does not "grant the power to construe the terms of the plan." *Ingram*, 244 F.3d at 1112. In *Ingram*, the court held that a plan did not confer discretion, but merely identified the carrier as the entity that was to pay benefits and administer the plan. *Id*. The plan provided that:

> The carrier solely is responsible for providing the benefits under this Plan . . . . The carrier will make all decisions on claims and has reserved the right to examine medically an individual for whom claim is made at any time during the period of disability. Accordingly, the management and control of the operation and administration of claim procedures under the Plan, including the review and payment or denial of claims and the provision of full and fair review of claim denial pursuant to Section 503 of the Act, shall be vested in the carrier.

*Id*. at 1112.

Aetna contends that the SDP advises plan participants that Aetna has discretionary authority to determine LTD benefits because it provides that, "Aetna will conduct an independent evaluation to determine your eligibility for Cox LTD benefits," and "Aetna, the claims administrator, has final authority to determine the amount of benefits that will be paid on any particular benefit claim." While these clauses do provide that Aetna will

independently evaluate whether beneficiaries are eligible for benefits, they do not state that Aetna has the power to construe the terms of the plan. They also do not explicitly provide that Aetna may exercise discretionary authority in making eligibility decisions. The language of the SDP is similar to that of the plan in *Ingram*, which provided that the carrier would "make all decisions on claims," had the right to "examine medically an individual for whom a claim is made at any time during the period of disability," and which vested in the carrier "the management and control of the operation and administration of claim procedures . . . including the review and payment or denial of claims." *See id*. That language was held to be insufficient to confer discretionary authority. *See id*.

Moreover, the SDP contains unambiguous language conferring discretionary authority upon the plan administrator, Cox, but not upon the claims administrator, Aetna:

> Aetna, the *claims administrator*, has final authority to determine the amount of benefits that will be paid on any particular benefit claim. In making such determinations, the *plan administrator* has the complete discretion and authority to make factual findings regarding a claim and to interpret the terms of the plan as they apply to the claim. In any case, you will receive only those benefits under the plan that the *plan administrator* in its *sole discretion*, determines you are entitled to receive.

(AET/ROU 110) (emphasis added). The authors of the SDP could have easily included language giving Aetna the same authority given to Cox. The discrepancy suggests that Aetna was not given discretionary authority. If language only arguably confers discretion, it does not unambiguously confer discretion, and the court must review the administrator's decision de novo. *Feibush v. Integrated Device Tech., Inc., Employee Benefit Plan*, 463 F.3d 880, 884 (9th Cir. 2006).

## B. The ASA and SDP Conflict With the Plan Document

Aetna nevertheless contends that it has discretionary authority pursuant to the ASA, which provides that:

> Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, Aetna will be the "appropriate named fiduciary" of the Plan for purpose of reviewing denied claims under the Plan. In exercising such fiduciary responsibility, Aetna will have discretionary authority to determine entitlement to Plan benefits

as determined by the Plan Documents for each claim received and to construe the terms of the Plan. It is also agreed that Aetna's decision on any claim is final and that Aetna has no other ERISA Fiduciary responsibility under the Plan.

(AET/ROU 167). Aetna further contends that the SDP confirms that the administration of claims is controlled by the ASA because the SDP states: "[b]enefits for the medical, dental and long-term disability plans are provided under the administrative services contract number 50398/779409."

However, as Roush correctly argues, Aetna cannot rely on a grant of discretionary authority located in the SDP or the ASA if the Plan document itself does not give Aetna discretionary authority. Aetna has not directed the Court to any language in the Plan that explicitly purports to give Aetna discretionary authority to make claims decisions. The only language Aetna points to is a statement in the Plan that provides,

These benefits are not insured with [Aetna] but will be paid from employer funds. Aetna will provide certain administrative services under the Plan as outlined in the Administrative Services Agreement between Aetna and the Customer.

ASA: 779409

***

This Booklet may be an electronic version of the Booklet on file with your Employer and [Aetna]. . . . To obtain a printed copy of this Booklet, please contact your Employer.

(AET/ROU 140). Saying that Aetna will provide "certain administrative services" under the Plan does not amount to explicit grant of discretionary authority, nor is that language likely to inform beneficiaries that the ASA includes a substantial enlargement of Aetna's authority.[2]

---

[2]It is not clear that Cox employees even had access to the ASA. There is no evidence in the record that a written copy of the ASA was handed to Cox employees. Further, it is not clear whether the sentence, "To obtain a printed copy of this Booklet, please contact your employer," refers to a copy of the Plan document or a copy of the ASA. A formal plan document is one that a plan participant can read to determine his rights and obligations under the plan. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (One of ERISA's basic purposes is to afford employees the opportunity to inform themselves, "on

The SDP specifically provides that the "plan document is the controlling legal document covering the provisions of the plans or programs within the Welfare Plan," and that, "[i]f there are any discrepancies between this handbook and the plan document, the plan document will govern." Thus, it is the Plan document itself, which does not contain a grant of discretionary authority to Aetna, and not the SDP or the ASA, that governs.

In similar circumstances, the Seventh Circuit held that there was no explicit grant of discretionary authority. In *Schwarz v. Prudential Life Insurance Co. of America*, 450 F.3d 697, 698 (7th Cir. 2006), the plan document stated, "We may request that you send proof of continuing disability, satisfactory to Prudential, indicating that you are under the regular care of a doctor." The court held that this language was insufficient to confer discretionary authority upon Prudential. *Id*. at 698-99. The SDP, however, stated that Prudential had discretion to make benefits determinations. *Id*. The SDP and the plan document were therefore in conflict. Relying on its own, as well as on Ninth and Eleventh Circuit precedents, the court held that when the Plan and the SDP conflict, the plan governs–unless the plan beneficiary has reasonably relied on the SDP to his detriment. *Id*. After all, an SDP is supposed to be an accurate summary of plan terms,

---

examining the plan documents, of their rights and obligations under the plan."). Given the ambiguity in the language cited above, Roush may not have realized that he had the right to request a copy of the ASA, nor is it clear that he could in fact do so.

In addition, unlike cases that have found that an ASA was incorporated into an ERISA plan, there is no clause in the Plan document that explicitly states that the ASA is a formal plan document. *Cf. Luck v. Metro. Life Ins. Co.*, No. EDCV 05-917-VAP(SGLx), 2006 WL 2582939, at *6, 2006 U.S. Dist. LEXIS 67508, at *15-16 (C.D. Cal. Aug. 29, 2006) (finding that ASA was incorporated into the Plan where the SDP explicitly stated, "The formal plan documents consist of . . . [t]he pertinent contracts between [the administrator] and the insurance company and other firms which provide services under the Plans."); *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 811-12 (7th Cir. 2006) (holding that defendant insurance company was a fiduciary and had discretionary authority based on language in the ASA because there was an amendment to the plan that explicitly stated that "An Administrative Named Fiduciary may be identified by entering into an Administrative Services Agreement with the Plan"), abrogated on other grounds by *Glenn*, 128 S. Ct. 2343.

- 17 -

"not an unnegotiated enlargement of the administrator's authority."  Therefore, de novo review was warranted.  *Id.* at 700.  *See also Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 870-72 (7th Cir. 2006)  (holding that where a Certificate of Insurance and an SDP purported to confer discretionary authority and the Plan document did not, and both the Certificate of Insurance and the SDP stated that they were not part of the Plan, discretionary authority was not conferred upon the insurer); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1162 (9th Cir. 2001) (holding that a Benefit Summary document did not confer discretionary authority upon an insurer because the language conferring discretion did not appear in a rider or amendment as required by the policy, which purported to be fully integrated); *Bergt v. Retirement Plan for Pilots Employed by Mark Air, Inc.*, 293 F.3d 1139, 1144-46 (9th Cir. 2002) (holding that where the plan master document is more favorable to the employee than the SDP, it controls, despite contrary unambiguous provisions in the SDP).

The Court finds the Seventh Circuit's analysis persuasive.  The documents provided to Cox employees explicitly stated that the Plan document governs in the event of conflicts.  The Plan document does not purport to confer discretionary authority upon Aetna.  Even if the SDP and the ASA together purport to confer such authority, the Plan document, which does not, controls.

### C.  Discretionary Authority Was Not Properly Delegated to Aetna

Finally, to the extent that the SDP confers discretion upon the plan administrator (Cox), in order for Cox to delegate its authority to Aetna, it had to comply with 29 U.S.C. § 1005(c)(1).  Because Cox never properly delegated its authority, the ASA cannot confer discretion upon Aetna.

Under 29 U.S.C. § 1005(c)(1), an administrator may delegate its fiduciary responsibilities:

> The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

A delegation of the authority to administer an ERISA plan must be made in clear terms on plan documents.  In *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1283 (9th Cir. 1990), Metropolitan Life Insurance Company ("Metropolitan") made the decision to terminate the plaintiff's benefits.  The plan gave a Long-Term Disability Administration Committee discretionary authority to determine eligibility for benefits and to construe plan terms.  *Id*. at 1284.  The Plan also expressly authorized the Committee to designate another person as fiduciary for the administration of the plan:

> The LTD Administration Committee may delegate its authority with respect to the denial, granting, and administration of claims to a claim administrator, which may be an insurance company or other appropriate named fiduciary and may enter into a Claims Administration Agreement with such claim administrator for the handling and determination of claims including, but not limited to, the granting or denial of claims and any appeals therefrom.

*Id*.  Pursuant to that provision, the Committee designated Metropolitan as a plan fiduciary in a Claims Administration Agreement, which provided that Metropolitan would have fiduciary responsibility to review claim denials.  *Id*. "Because the Plan [gave] the [Committee] discretionary authority[,] and the Committee has properly designated Metropolitan as ERISA fiduciary," a deferential standard of review was warranted.  *Id*. at 1285.

In contrast, in *Rodriguez-Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 584-85 (1st Cir. 1993), the court held that delegation of the authority to administer an ERISA plan was improper.  The plan stated that "the Named Fiduciaries or their delegates have discretion in interpreting the meaning of Plan provisions and in determining questions of fact."  *Id*.  The plaintiff's claim was denied by the plan administrator, who was not given discretionary authority.  *Id*.  Because there were no provisions in the Plan that provided express procedures for the delegation of the fiduciary's discretionary authority to a delegate, and there was no expression of intent that the plan administrator act as the

delegate of the fiduciary, discretionary authority was not properly delegated to the plan administrator. *Id.*

Courts have generally found that delegation of discretionary authority is proper where a plan document such as the SDP, the Plan itself, or an amendment to the Plan, expressly authorizes a fiduciary to delegate its authority, and the delegation of that authority is found in an ASA. In *Semien*, the Plan provided that the plan administrator had authority to construe plan provisions and to determine eligibility for benefits. 436 F.3d at 811-12. The plaintiff contended that the old plan administrator had not properly delegated its discretionary authority to the new plan administrator that denied his claim because only the original Plan document could be considered in determining whether the new administrator was entitled to deference. *Id.* An amendment to the Plan expressly provided that an administrative named fiduciary could be identified by entering into an ASA with the Plan. *Id.* The court held that because the ASA provided that the new administrator would exercise discretionary authority over the plan, as had the original plan administrator, the new administrator's decision would be reviewed deferentially. *Id.*

Likewise, in *Kinser v. Plans Admin. Comm. of Citigroup, Inc.*, 488 F. Supp. 2d 1369 (M.D. Ga. 2007), the Plan expressly gave the plan administrator and fiduciary the authority "to *designate* one or more persons to be responsible for certain administrative functions vested in the [plan administrator] under the terms of the Plan [and] such person or persons shall be entitled to act on behalf of the [plan administrator] in performing the administrative functions delegated by the [plan administrator]." *Id.* at 1377 (emphasis in original). An ASA stated that the plan administrator had delegated its discretionary authority to Metropolitan Life Insurance Company ("MetLife"). *Id.* at 1371. The court found that MetLife's decision to deny benefits was entitled to deferential review because "the Plan clearly allows [the plan administrator and fiduciary] to delegate its discretionary authority," and the ASA properly delegated the plan administrator's discretionary authority to MetLife. *Id.* at 1377.

In contrast, where the plan documents do not give the fiduciary the power to delegate its authority, delegation is improper even when an ASA purports to delegate such authority. In *Anderson v. Unum Life Insurance Co. of America*, 414 F. Supp. 2d 1079 (M.D. Ala. 2006), Unum Life Insurance Company of America ("Unum"), which was designated in the policy as the entity with discretionary authority to determine eligibility for benefits, delegated its authority its parent company, UnumProvident through a General Services Agreement. *Id.* at 1095-96. UnumProvident made the decision to deny the beneficiary's claim for long term disability benefits. *Id.* at 1098. The court found that de novo review was warranted because there was no language in the plan that allowed Unum to delegate its discretionary authority to a third party. *Id.* at 1099-1100.

Aetna points out that the Plan states that "Aetna will provide certain administrative services under the Plan as outlined in the Administrative Services Agreement between Aetna and [Cox]," and that the SDP states that, "[b]enefits for the medical, dental and long-term disability plans are provided under the administrative services contract number 50398/779409." However, Aetna does not point to any language in the Plan or otherwise, and the Court cannot find any language, that expressly permits Cox, the plan administrator, to delegate its discretionary authority to a third party. As a result, even if the SDP purports to confer discretionary authority upon Cox, that authority was not properly delegated to Aetna.

## III.   Aetna's Termination of Roush's Benefits was Arbitrary and Capricious

It is also apparent from the record that Aetna's decision to terminate Roush's benefits was arbitrary and capricious. An ERISA administrator acts arbitrarily if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plan's plain language, or (3) relies on clearly erroneous findings of fact. *Boyd v. Bell*, 401 F.3d 1173, 1179 (9th Cir. 2005). There is no clear "checklist" of factors that indicates arbitrariness. Some of the factors that frequently arise in the ERISA context are whether the administrator was operating under a conflict of interest, the

quality and quantity of medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination. *Montour v. Hartford Life & Accident Ins. Co.*, 582 F.3d 993, 940 (9th Cir. 2009); *Glenn*, 128 S. Ct. at 2351 (endorsing a combination-of-factors method of review and explaining that conflicts of interest "are but one factor among many that a reviewing judge must take into account"); *Glenn,* 128 S. Ct. at 2335 ("[The insurer's] decision was not the product of a principled and deliberative reasoning process. [The insurer] failed to acknowledge the contrary conclusion reached by the [SSA], gave scant weight to contrary medical evidence[,] . . . and neglected to provide its internal experts [all of the evidence]. In these circumstances, [the court] was justified in finding an abuse of discretion wholly apart from [the insurer's] conflict of interest.) (Roberts, J., concurring); *Abatie*, 458 F.3d at 969 ("What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records.").

There were a number of procedural irregularities in Aetna's review of Roush's claim. For instance, Aetna failed to grapple with the ALJ's contrary disability determination. The Plan requires claimants to apply for SSDI and, if denied, to exhaust all possible appeals. On January 24, 2007, Aetna advised Roush that it believed he was eligible for SSDI based on his medical documentation. Aetna also hired Allsup to represent Roush during the Social Security proceedings. In September 2008, the ALJ found that Roush was unable to engage in any substantial gainful activity and awarded Roush benefits. The award resulted in a dollar-for-dollar financial offset to the Plan. Nevertheless, on January 26, 2009, Aetna sent Roush's attorney a letter explaining that it had reached an unfavorable decision on Roush's appeal. Aetna acknowledged the ALJ's decision but did not articulate why the ALJ might have reached a different conclusion.

Aetna merely stated that the ALJ's decision was reviewed but that there was no "clinical evidence" to support an impairment. The ALJ's decision specifically alluded to clinical evidence that supported Roush's claim. Aetna should have, but did not explain why it disagreed with the ALJ as to the existence of such evidence, or why the evidence failed to show impairment.

Aetna also failed to consider the administrative record that was before the ALJ. "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." *Montour*, 582 F.3d at 946. Although the Plan places the burden on Roush to submit proof of his disability, plan administrators working with an apparently deficient administrative record must inform claimants of the deficiency and provide them with an opportunity to resolve the problem by furnishing the missing information. *See id.* Aetna challenges the evidentiary basis for Roush's contention that he attempted to obtain his claim file from Allsup to submit to Aetna and that Allsup failed to respond. The evidentiary dispute need not be decide because Aetna never informed Roush that the record was missing, and without the full record, Atena's ability to conduct a full and fair review was compromised.

Another factor suggesting that Aetna failed to properly investigate Roush's claim was Aetna's decision to conduct a "pure paper" review, instead of exercising its right under the Plan to have a medical professional examine Roush. *See Montour*, 582 F.3d at 944 (insurer's decision to conduct "pure paper" review was a factor that suggested the insurer abused its discretion); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (holding that although an administrator's reliance on a file review does not, standing alone, require the conclusion that the administrator acted improperly, the failure to conduct a physical examination–especially where the right to do so is specifically reserved in the plan–may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination). The fact that Aetna's reviewing doctors spoke with Roush's treating physician does not fully mitigate Aetna's failure to have its doctors

personally evaluate Roush. The need to examine a claimant is more pronounced when that person alleges a psychiatric disability which objective medical evidence cannot fully corroborate. *See, e.g.*, *Wilson v. John C. Lincoln Health Network Group*, No. CV-04-1373-PHX-NVW, 2006 WL 798703, at *9, 2006 U.S. Dist. LEXIS 14540, at *24-25 (D. Ariz. Mar. 28, 2006) (explaining that the failure of administrator to perform its own examination of patient who was complaining of severe pain from fibromyalgia, a condition which sometimes results in no recognizable objective basis for symptoms, was a factor that suggested arbitrariness); *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380, at *7-8, 2006 U.S. Dist LEXIS 41494, at *12-16 (W.D.N.Y. June 21, 2006) (it was arbitrary and capricious for an administrator to rely solely on the opinion of a non-treating, non-examining doctor in denying plaintiff's claim based on psychiatric disability because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the claimant). Aetna's failure to have its reviewers examine Roush therefore suggests arbitrariness.

Aetna also failed to address all of Roush's evidence. A plan administrator may not arbitrarily refuse to credit a claimant's reliable evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). As part of his appeal, Roush submitted Dr. Generaux's vocational report, which concluded that Roush could not engage in any occupation. Dr. Generaux's report was based on an interview with Roush, a review of Roush's treating physician's notes and examination results, and on the ALJ's favorable decision. Although Dr. Rummler included Dr. Generaux's vocational report in the list of documents he said he considered, he never discussed Dr. Generaux's report in his analysis. Aetna also noted in its denial letter that it had considered Dr. Generaux's report, but also failed to discuss why the report was unreliable or why Aetna disagreed with its conclusions. An administrator need not consider vocational evidence to justify its decision that the claimant is not disabled under the "any occupation" standard if other evidence in the administrative record supports the conclusion that the claimant does not have an impairment which would prevent him from performing some identifiable job.

*See McKenzie v. General Tel Co. of California*, 41 F.3d 1310, 1317 (9th Cir. 1994), overruled on other grounds by *Saffon*, 522 F.3d 863. In this case, however, Dr. Generaux's report stated that Roush could not perform any occupation, and there was no other evidence in the record suggesting that he could. In the absence of such evidence or at least an explanation as to why Dr. Generaux's report was unreliable or incorrect, Aetna's failure to discuss Dr. Generaux's report suggests arbitrariness.

Finally, Aetna never told Roush what he needed to do to supplement the record. An ERISA administrator is required to engage in meaningful dialogue with a beneficiary and to give the beneficiary "[a] description of any additional material or information" that is "necessary" to "perfect the claim," and to do so "in a manner calculated to be understood by the claimant." *Saffon*, 511 F.3d at 1213 (quoting 29 C.F.R. § 2560.503-1(g)). In its initial denial letter, Aetna informed Roush that, as part of his appeal, he could provide "a detailed narrative report, outlining in objective terms the specific physical and/or mental limitations inherent to your condition . . . [and a] physician's prognosis including current course of treatment, frequency of visits, [and] specific medications prescribed." The letter also stated, in general terms, that Roush could provide "copies of diagnostic studies conducted . . . such as test results, X-rays, laboratory data, and clinical findings." Roush may have reasonably believed that the "Severity of Mental Impairment Report" he submitted, along with the vocational report from Dr. Generaux, the notes from Dr. Waite, and his list of his medications, satisfied these requirements. In its final denial letter, however, Aetna told Roush that there was a lack of medical evidence to substantiate his claim, and specifically cited as a grounds for its decision that he had not provided "a formal mini mental status examination, psychological or neuropsychological testing to document cognitive deficits, or evidence of more intensive treatment such as ongoing therapy" to support his claim. Insofar as Aetna believed that a particular kind of test, evidence of more treatment, or some other means of objectively testing Roush's ability to perform his job was necessary for it to

evaluate Roush's claim, Aetna was required to say so at a time when Roush had a fair chance to present evidence on that point. *See Saffon*, 511 F.3d at 1215.

For these reasons, Aetna did not conduct a full and fair review of Roush's claim. Its decision to terminate Roush's benefits was therefore arbitrary and capricious.

**IV. Remedy**

The Court has reviewed the administrative record in its entirety. This is a close case. The diminishing frequency of Roush's visits with Dr. Waite, the changing tenor of Dr. Waite's notes (stating, for example, that Roush's panic attacks had become less frequent), and Roush's failure to seek therapy or additional treatment for his condition suggest that Roush was improving and that, at some point, he was no longer disabled as defined by the Plan. On the other hand, Dr. Waite continued to insist that Roush remained in essentially the same condition as when he first applied for benefits. The failure of Aetna's reviewing doctors to examine Roush and to consider all of the evidence undermines their credibility. Both Dr. Generaux and the ALJ concluded that Roush was disabled, and Aetna did not explain why it disregarded their opinions. Without the benefit of the claim file that was before the ALJ, the Court cannot be confident that it has all of the information it needs to decide whether Aetna's decision to terminate Roush's benefits was correct.

In any event, the Court need not make a determination de novo because the Court has found that Aetna did not afford Roush a full and fair review and that its decision to terminate Roush's benefits was arbitrary and capricious. *See Wilson,* 2006 WL 798703, at *4, 2006 U.S. Dist. LEXIS 14540, at *11 (although de novo review was warranted, the court declined to apply de novo review because it was clear that plan administrator abused its discretion in making benefits determination); *Merril v. Hartford Life & Accident Insurance Co., 503 F. Supp. 2d 531, 537-38* (D. Conn. 2007) (court was unable to determine, upon a de novo review of the record, whether the insurer's decision to deny benefits was correct, and therefore remanded the case to the insurer to reconsider its decision and conduct a full and fair review of the beneficiary's claim).

The ERISA claimant whose initial application for benefits was wrongfully denied is entitled to have a different remedy than the claimant whose benefits have been terminated. *Pannebecker v. Liberty Life Assurance Co. of Boston*, 524 F.3d 1213, 1221 (9th Cir. 2008). Where an administrator's initial denial is premised on a failure to apply plan provisions properly, the proper course of action is to remand to the administrator to apply the terms correctly in the first instance. *Id*. "But if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions." Id. This distinction in remedies makes perfect sense as the improper termination in the latter case was the result of arbitrary and capricious procedures, and therefore benefits could not have been terminated by those procedures. *Id*. Whether the administrator abused its discretion because the decision was substantively arbitrary or capricious, or because it failed to comply with required procedures, benefits may still be reinstated if the claimant would have continued receiving benefits absent the administrator's arbitrary and capricious conduct. *Id*.

The Seventh Circuit holds that the proper remedy where an administrator has made a determination under the "own occupation" standard but not under the "any occupation" standard, and the administrator's decision was arbitrary and capricious, is to award retroactive benefits for the period during which the claimant was receiving benefits under the "own occupation" standard and to remand to the administrator to decide whether the claimant is disabled under the "any occupation" standard. *Packovich v. Broadspire Servs.*, 535 F.3d 601, 607-08 (7th Cir. 2008). Otherwise, reinstatement would undermine the rule that the plan administrator must have the first opportunity to decide the "any occupation" issue, since, in essence, awarding retroactive benefits amounts to the district court deciding that the claimant is disabled. *Id*. In our case, however, although Roush's benefits were initially terminated three months before the twenty-four month "own occupation" period expired, Aetna's decision on appeal, issued nearly ten months later, was that Roush did not meet the "any occupation"standard. Because Aetna has already

made a determination that Roush was not disabled under the "any occupation" standard, this case most closely resembles *Pannebecker*, where the court held that retroactive reinstatement to the date of judgment was appropriate. *See Austin v. Life Ins. Co. of N. Am.*, No. CV 08-8445 PA (MANx), 2010 U.S. Dist. LEXIS 38294, at *43-44, 2010 WL 1576718, at *15-16 (C.D. Cal. Apr. 13, 2010) ("If the Court were to remand Plaintiff's claim to [the insurer] so it could again decide whether Plaintiff was eligible under the 'any occupation' standard, [the insurer] would be afforded a 'second bite at the apple.' Given that the evidence establishes [the insurer] abuse of its discretion . . . there is no basis on which to find that such an opportunity is warranted."). Therefore, the Court will order that Roush's benefits be reinstated, and that Roush be awarded the benefits that were improperly terminated by Aetna with prejudgment interest in accordance with the rate set forth in 28 U.S.C. § 1961. Of course, Aetna is not precluded from further proper proceedings to determine whether Roush continues to meet the requirements for "any occupation" benefits. Finally, the Court may award attorneys's fees to Roush upon motion. *See Hardt v. Reliance Standard Life Ins. Co.,* No 09-448 (U.S. May 24, 2010); *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984).

IT IS THEREFORE ORDERED that Roush's Motion for Summary Judgment (doc. #39) is granted to the extent that he be awarded the terminated benefits to continue until such time as Aetna may determine, after proper procedures, that Roush fails to meet the requirements for "any occupation" benefits.

IT IS FURTHER ORDERED that Aetna's Motion to Strike (doc. #41) is denied as moot.

IT IS FURTHER ORDERED that the Clerk enter judgment that Roush's benefits be reinstated, and that Roush be awarded the benefits that were terminated by Aetna with prejudgment interest at the federal rate from the date each such payment should have been made, to continue until such time as Aetna may determine, after proper procedures, that Roush fails to meet the requirements for "any occupation" benefits. The Clerk shall terminate this action.

Dated: May 24, 2010.

_____
Neil V. Wake
United States District Judge